IN THE UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF ARKANSAS
FAYETTEVILLE DIVISION

GRAND RIVER ENTERPRISES SIX
NATIONS, LTD., and HEBER SPRINGS
WHOLESALE GROCERY, INC.                                    PLAINTIFFS

                v.              Civil No. 05-5051

MIKE BEEBE, in his official
capacity as Attorney General,
State of Arkansas                                           DEFENDANT

                        O R D E R

    Now on this 6th day of March, 2006, comes on for
consideration **Defendant's Motion To Dismiss** (document #12), and
from said motion, and the response thereto, the Court finds and
orders as follows:

    1.   Plaintiffs seek to permanently enjoin enforcement of an
Arkansas statute, **A.C.A. §26-57-261**, referred to herein as the
Allocable Share Amendment or the Amendment.  They claim that the
Amendment violates the Sherman Act; Article 2, § 19 of the
Arkansas Constitution; the First Amendment of the United States
Constitution; Article 2, §4 and §6, of the Arkansas Constitution;
the Equal Protection Clause of the Fourteenth Amendment of the
United States Constitution; Article 2, §3 and §18 of the Arkansas
Constitution; the Due Process Clause of the Fourteenth Amendment
of the United States Constitution; Article 2, §21, of the Arkansas
Constitution; and the Commerce and Supremacy Clauses of the United
States Constitution.

    Defendant moves to dismiss these claims, taking the position

that plaintiffs have failed to state claims upon which relief can be granted, and that separate plaintiff Heber Springs Wholesale Grocery, Inc., lacks standing to sue.

2.    Defendant first challenges the standing of separate defendant Heber Springs Wholesale Grocery, Inc. ("Heber Springs") under the teachings of **Lujan v. Defenders of Wildlife, 504 U.S. 555 (1992),** under which standing requires the following:

> First, the plaintiff must have suffered an injury in fact - and invasion of a legally protected interest which is (a) concrete and particularized, and (b) actual or imminent, not conjectural or hypothetical.  Second, there must be a causal connection between the injury and the conduct complained of - the injury has to be fairly . . . trace[able] to the challenged action of the defendant, and not . . . th[e] result [of] the independent action of some third party not before the court. Third, it must be likely, as opposed to merely speculative, that the injury will be redressed by a favorable decision.

**504 U.S. at 560-61** (internal citations and quotation marks omitted).

A review of the Complaint reflects that Heber Springs claims to be "licensed to distribute, wholesale and sell tobacco products in the State of Arkansas, including in this District," and that it "has, or intends to, engage in a substantial amount of trade and commerce in this District."  (¶10)  It is alleged that the effects of the statute herein challenged will be "a significant loss of sales and market share for Plaintiffs and a loss in their trade relationships with retailers and distributors." (¶38)

Although  sketchy,  the  Court  believes  these  allegations

(fleshed out as they are by a multitude of factual allegations mainly relating to separate plaintiff Grand River Enterprises Six Nations, Ltd.) are sufficient to assert an invasion of Heber Springs' present interest in the constitutionality *vel non* of the challenged statute. These allegations suffice under **Lujan**, and the Motion To Dismiss as to Heber Springs for lack of standing will, therefore, be denied.

3. The applicable standard on a motion to dismiss for failure to state a claim is well settled:

> A complaint should not be dismissed for failure to state a claim unless it appears beyond doubt that the plaintiff can prove no set of facts in support of his claim which would entitle him to relief. A complaint must be viewed in the light most favorable to the plaintiff and should not be dismissed merely because the court doubts that a plaintiff will be able to prove all of the necessary factual allegations. Thus, as a practical matter, a dismissal under Rule 12(b)(6) is likely to be granted only in the unusual case in which a plaintiff includes allegations that show on the face of the complaint that there is some insuperable bar to relief.

**Krentz v. Robertson Fire Protection District**, **228 F.3d 897 (8th Cir. 2000)** (internal citations and quotation marks omitted).

4. The factual allegations of the Complaint may be summarized as follows[1]:

* Plaintiff Grand River Enterprises Six Nations, Ltd.

---

[1]In preparing this summary, the Court has set forth the actual text of statutes, rather than the summaries thereof contained in the Complaint, and has omitted plaintiffs' legal conclusions drawn from the facts, inasmuch as it is the function of the Court on a motion to dismiss to determine if the facts - assuming them true - would warrant the conclusions posited.

("Grand River") is a producer and packager of tobacco products, which does business in the State of Arkansas.

* Plaintiff Heber Springs is a distributor of tobacco products in the State of Arkansas, with its principal place of business in Heber Springs, Arkansas. It "has, or intends to, engage in a substantial amount of trade and commerce in this District."

* In 1998, Arkansas, along with 45 other states and six territories (the "Settling States"), settled litigation seeking reimbursement for medical costs associated with tobacco use. The settlement was memorialized in a document entitled the Master Settlement Agreement ("MSA"), and the settling tobacco companies are generally referred to as "Original Participating Manufacturers" or "OPMs."

* The MSA provides for annual payments by each OPM for the benefit of the Settling States. The amount of each such payment is based principally on the relative national market share of the OPM making the payment. The payments are divided among the Settling States based on a fixed formula that apportions the payment into what is referred to as each Settling State's "Allocable Share."

* The MSA imposes restrictions on the OPMs in the areas of advertising, political lobbying, trade association activities, and legal challenges to state laws regulating tobacco, which could not

have been constitutionally imposed on the OPMs without their agreement.

\* After the MSA was signed, tobacco manufacturers who were not named as defendants in the litigation were offered an opportunity to sign the MSA. Those who elected to sign are referred to as "Subsequent Participating Manufacturers" or "SPMs," and the entire group of MSA signatories is referred to as "Participating Manufacturers" or PMs. Those manufacturers who elected not to sign the MSA are referred to as Nonparticipating Manufacturers or "NPMs." Grand River is an NPM.

\* The Settlement was designed to reimburse the Settling States for harm caused by the PMs' wrongful conduct dating back to the 1950's; to protect PM's dominant market share by imposing similar costs on other tobacco manufacturers, whether or not they signed the MSA; and to freeze SPMs' market shares at 1997 or 1998 levels.

\* The MSA contained incentives to the Settling States to enact statutes which would require NPMs (who were not subject to the payments required of PMs) to place money in escrow each year based on their market shares, such money to be held to settle or pay judgments in possible future lawsuits against them. Arkansas enacted such a law, codified at **A.C.A. §26-57-260 and 261,** and referred to as the Escrow Statute. As originally enacted, **A.C.A. §26-57-261** provided, in relevant part, as follows:

Any tobacco product manufacturer selling cigarettes to consumers within the state . . . after the date of enactment of this section, shall do one (1) of the following:

(1) Become a participating manufacturer, as that term is defined in section II(jj) of the Master Settlement Agreement, and generally perform its financial obligations under the Master Settlement Agreement; or

(2)(A) Place into a qualified escrow fund by April 15 of the year following the year in question the following amounts. . . .

(B) A tobacco product manufacturer that places funds into escrow pursuant to subdivision (a)(2)(A) of this section shall receive the interest or other appreciation on such funds as earned. Such funds themselves shall be released from escrow only under the following circumstances:

(i) To pay a judgment or settlement on any released claim brought against such tobacco product manufacturer. . . .

(ii) To the extent that a tobacco manufacturer establishes that the amount it was required to place into escrow in a particular year was greater than the State's allocable share of the total payments that such manufacturer would have been required to make in that year under the Master Settlement Agreement, as determined pursuant to section IX(i)(2) of the Master Settlement Agreement and before any of the adjustments or offsets described in section IX(i)(3) of that agreement other than the inflation adjustment, had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer.

ii) To the extent not released from escrow under subdivisions (a)(2)(A)(i) or (a)(2)(A)(ii) of this section, funds shall be released from escrow and revert back to such tobacco product manufacturer twenty-five (25) years after the date on which they were placed into escrow.

\* **A.C.A. §26-57-261(2)(B)(ii)** was known as the "Allocable

Share Refund" provision.  It insured that an NPM would not pay more, under the Escrow Statute, than the amount Arkansas would have received from the manufacturer if it had been a PM.

\* In February, 2005, the Arkansas General Assembly amended the Allocable Share Refund provision by **Act 384 of 2005**.  The amended provision (the "Allocable Share Amendment"), is codified at **§26-57-261(a)(2)(B)(ii),** and provides as follows:

> To the extent that a tobacco product manufacturer establishes that the amount it was required to place into escrow on account of units sold in the state in a particular year was greater than the Master Settlement Agreement payments, as determined under section IX(i) of the Master Settlement Agreement including after final determination of all adjustments, that the manufacturer would have been required to make on account of the units sold had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer. . . .

\* Under the Allocable Share Amendment, Grand River's escrow payments for sales in Arkansas will be greater than the amount Arkansas would have received if Grand River were a PM.

\* Grand River has not been found liable for wrongful conduct, or even sued for such conduct, and there is no basis to believe that Grand River will be found liable for greater damages than the PMs during the next 25 years.

\* The State of Arkansas stipulated, in state court proceedings involving the MSA, that the Escrow Statute as originally enacted, would "effectively and fully neutralize" the cost disadvantages that PMs would experience *vis a vis* NPMs.

*    The purpose of the Allocable Share Amendment is to coerce NPMs to join the MSA, thereby making non-refundable MSA payments and waiving certain First Amendment rights.

*    An additional purpose of the Amendment is to cause the NPMs to raise their cigarette prices so as to prevent them from competing in the Arkansas market against PMs.

*    The effect of the Allocable Share Amendment is that of an output cartel and price fixing scheme among the PMs.

*    Retroactive application of the Allocable Share Amendment burdens Grand River with an additional $3,000,000.00 in escrow costs for its 2004 sales, which were not anticipated in its 2004 pricing structure.  This financial hardship threatens Grand River's future viability.

*    The Amendment will force Grand River to raise its prices, with a corresponding drop in sales.

*    Count I alleges federal and state antitrust violations, the gist of which is that the Allocable Share Amendment is designed to force Grand River, and other NPMs, to raise their prices, so as to prevent competition with PMs.

*    Count II alleges violations of federal and state constitutional freedom of speech and association guarantees, and more particularly that Allocable Share Amendment is designed to coerce Grand River, and other NPMs, into signing the MSA, which would require them to give up certain free speech rights.

\*     Count III alleges violations of federal and state constitutional guarantees of equal protection based on the classification system used in the Allocable Share Amendment.

\*     Count IV alleges federal and state due process violations said to arise from the "seizure" of Grand River's escrow deposits before Grand River has been found liable for wrongful conduct.

\*     Count V alleges violations of the Commerce and Supremacy Clauses of the United States Constitution, the gist of which is that the Allocable Share Amendment unjustifiably burdens interstate commerce and imposes a national cost on a state-wide business.

4.   Defendant first contends that plaintiffs' antitrust claims are subject to dismissal.  Defendant contends that the Allocable Share Amendment is a unilateral act of the State of Arkansas, and as such, is immune from antitrust scrutiny under the doctrine of state action immunity.

Plaintiffs argue that the Allocable Share Amendment creates a form of "hybrid restraint" of competition, an exception to the state action doctrine.  They summarize their antitrust claim thus: the effect of the MSA, as implemented by the Amended Allocable Share Refund provision, is to increase NPM costs, reduce pricing pressure on OPMs, and encourage PMs to reduce their output.

The Allocable Share Amendment is an act of the Arkansas

Legislature, and as such, the Sherman Act issue is analyzed according to special rules that have developed over the years with regard to the antitrust effect of state statutes, and which make the acts of state sovereigns virtually immune to attack under federal antitrust provisions.

The state action immunity doctrine arose out of the case of **Parker v. Brown**, **317 U.S. 341 (1943),** wherein it was decided that the Sherman Act was directed to individual rather than state action, and was not violated by state regulatory programs.  It was further developed in **Rice v. Norman Williams Co.**, **458 U.S. 654 (1982),** where the Court stated that

> [i]n determining whether the Sherman Act pre-empts a state statute, we apply principles similar to those which we employ in considering whether any state statute is pre-empted by a federal statute pursuant to the Supremacy Clause.  As in the typical pre-emption case, the inquiry is whether there exists an irreconcilable conflict between the federal and state regulatory schemes. The existence of a hypothetical or potential conflict is insufficient to warrant the pre-emption of the state statute.  A state regulatory scheme is not pre-empted by the federal antitrust laws simply because in a hypothetical situation a private party's compliance with the statute might cause him to violate the antitrust laws.  A state statute is not pre-empted by the federal antitrust laws simply because the state scheme might have an anticompetitive effect.
>
> *        *        *
>
> Our decisions in this area instruct us . . . that a state statute, when considered in the abstract, may be condemned under the antitrust laws only if it mandates or authorizes conduct that necessarily constitutes a violation of the antitrust laws in all cases, or if it places irresistible pressure on a private party to violate the antitrust laws in order to comply with the

statute. Such condemnation will follow under §1 of the Sherman Act when the conduct contemplated by the statute is in all cases a *per se* violation.  If the activity addressed by the statute does not fall into that category, and therefore must be analyzed under the rule of reason, the statute cannot be condemned in the abstract. Analysis under the rule of reason requires an examination of the circumstances underlying a particular economic practice, and therefore does not lend itself to a conclusion that a statute is facially inconsistent with federal antitrust laws.

**458 U.S. at 659-61.**

In **324 Liquor Corp. v Duffy, 479 U.S. 335 (1987),** the Court noted that it had, over time, established a two-part test for determining state action immunity under **Parker**:  the challenged restraint must be "clearly articulated and affirmatively expressed as state policy," and must be "actively supervised by the state itself."  **479 U.S. at 343.**  Yet even those requirements do not apply when the restraint under consideration is a state statute rather than the act of a subdivision of state government:

In the years since the decision in *Parker*, the Court has had occasion in several cases to determine the scope of the state-action doctrine.  It has never departed, however, from *Parker's* basic reasoning. . . . If the replacing of entirely free competition with some form of regulation or restraint was not authorized or approved by the State then the rationale of *Parker* is inapposite.  As a result, in cases involving the anticompetitive conduct of a nonsovereign state representative the Court has required a showing that the conduct is pursuant to a "clearly articulated and affirmatively expressed state policy" to replace competition with regulation.  The Court also has found the degree to which the state legislature or supreme court supervises its representative to be relevant to the inquiry.  When the conduct is that of the sovereign itself, on the other hand, the danger of unauthorized

-11-

restraint of trade does not arise.  Where the conduct at issue is in fact that of the state legislature or supreme court, we need not address the issues of "clear articulation" and "active supervision."

**Hoover v. Ronwin, 466 U.S. 558, 568-69 (1984)** (internal citations omitted).

There is a limited exception to the state action immunity doctrine, explained in **Fisher v. City of Berkeley, California, 475 U.S. 260 (1986)** as follows:

Not all restraints imposed upon private actors by government units necessarily constitute unilateral action outside the purview of §1 [of the Sherman Act]. Certain restraints may be characterized as "hybrid," in that nonmarket mechanisms merely enforce private marketing decisions.  Where private actors are thus granted "a degree of private regulatory power," the regulatory scheme may be attacked under §1.

**475 U.S. at 267-68.**

Plaintiffs suggest that the Allocable Share Amendment comes within the purview of the hybrid restraint exception to the state action immunity doctrine.  They reason that the MSA and its ancillary legislation contain such incentives for tobacco companies to increase their prices and keep their output levels the same, that it has the same effect on the market as if those companies had formed an "output cartel."

The Court does not agree with the proposition that if the potential *effect* of a statute on the market is as though private parties had created an output cartel, the statute necessarily runs afoul of the Sherman Act. It is only in very limited circumstances

that such occurs. **California Retail Liquor Dealers Association v. Midcal Aluminum, Inc.**, **445 U.S. 97 (1980)**, illustrates the extremely narrow circumstances in which a state statute will be pre-empted by the Sherman Act. In **Midcal**, a California statute *required* liquor dealers to set prices and imposed fines on those who sold for less. The state had no direct control over the prices, and did not review the prices that were set. The Court held that the statute was pre-empted because it literally mandated price-fixing by private parties. In an oft-quoted passage, the Court stated that the "national policy in favor of competition cannot be thwarted by casting such a gauzy cloak of state involvement over what is essentially a private price-fixing arrangement." **445 U.S. at 97.**

In **Midcal**, what the state did was essentially to bless private antitrust conduct and enforce violations. In the case at bar, there is no allegation that the Allocable Share Amendment mandates or authorizes price-setting or output fixing by private parties. Instead, plaintiffs allege that the effect of the Allocable Share Amendment (in conjunction with the other statutes enacted pursuant to the MSA) is to cause or allow the PMs to conduct their business as though they were part of an output cartel. The Amendment, however, does not on its face authorize, much less require, such behavior. It simply establishes one aspect of the cost of doing business in Arkansas for those tobacco

-13-

companies who have chosen not to participate in the regulatory scheme established by the MSA. Individual tobacco companies remain free to raise or lower their prices or their output as they see fit, and there is, at worst, a hypothetical or potential conflict with federal antitrust law, not the irreconcilable conflict that would be required to invalidate the Amendment under federal anti-trust law.

For the foregoing reasons, the Court concludes that plaintiffs can prove no set of facts under which the Allocable Share Amendment would be pre-empted by the Sherman Act, and the Motion To Dismiss will be granted as to that claim.

5.   Defendant also contends that plaintiffs have failed to state a claim under Article 2, §19 of the Arkansas Constitution, which prohibits monopolies. Defendant relies on **Gipson v. Morley, 217 Ark. 560, 233 S.W.2d 79 (Ark. 1950),** where in it was said that

> the courts of Arkansas, like those of all American states, have sustained these monopolistic grants of special privilege on the ground that it is within the competency of the legislature to determine under the police power what regulatory rules are needful in controlling a type of business fraught with perils to public peace, health and safety as is the liquor business.

**217 Ark. at 567.**

The Emergency Clause of the Amendment makes it clear that the State of Arkansas also finds the tobacco business to be "fraught with perils to public . . . health and safety:

[i]t is found and determined by the General Assembly of

-14-

the State of Arkansas that smoking poses a serious
health risk to Arkansans;  that the Master Settlement
Agreement is a critical component in reducing the rate
of smoking in Arkansas; and that the provisions of this
act are immediately necessary for the continued
effective administration and enforcement of provisions
of the Master Settlement Agreement in Arkansas.

**Acts 2005, No. 384, §5.**  This is a clear expression by the
Arkansas Legislature that the regulatory scheme of which the
Amendment forms a part is created to serve the public interest.
Thus, to the extent that it might foster monopolistic conduct, it
would not violate Article 2, §19, of the Arkansas Constitution,
and plaintiffs' claim that it would do so must be dismissed.

6.   Defendant next argues that plaintiffs' freedom of speech
claims must be dismissed.

The gravamen of plaintiffs' First Amendment claim is that the
Act imposes penalties on Grand River, as an NPM, for refusing to
waive its First Amendment rights.  Fleshed out, this argument
appears to be (a) that because the Allocable Share Amendment
requires Grand River to pay more into its Arkansas escrow account
than the amount Arkansas would receive as its allocable share of
Grand River's MSA payment if Grand River were a PM, its freedom of
speech (maintained by not signing the MSA) is impermissibly
burdened, and (b) that it is being coerced, or at least
"needlessly encouraged," to waive certain free speech rights by
economic pressure to sign the MSA.

These arguments are based on the allegation that under the

Allocable Share Amendment, Grand River's escrow payments for sales in Arkansas will be greater than the amount Arkansas would have received if Grand River were a PM.  While this allegation must be accepted as true on a motion to dismiss, it misses the point. It is not an allegation that the regulatory scheme is so structured that it costs a tobacco manufacturer more to be an NPM than a PM. The Allocable Share Amendment does not require Grand River, or any other NPM, to pay more *per cigarette* into escrow than it would pay *per cigarette* under the MSA if it were a PM.  The relevant text of the Amendment is this:

> To the extent that a tobacco product manufacturer establishes that the amount it was required to place into escrow on account of **units sold in the state** in a particular year **was greater than the Master Settlement Agreement payments** . . . that the manufacturer would have been required to make on account of the units sold[2] had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer. . . .

**§26-57-261(a)(2)(B)(ii)** (emphasis added).

This differs from the Allocable Share Refund provision, which provided, in relevant part:

> To the extent that a tobacco manufacturer establishes that the amount it was required to place into escrow in a particular year **was greater than the State's allocable share of the total payments that such manufacturer would have been required to make in that year under the Master Settlement Agreement** . . . had it been a participating manufacturer, the excess shall be released from escrow and revert back to such tobacco product manufacturer.

---

[2]"Units sold" is defined as "the number of individual cigarettes sold in the state by the applicable tobacco product manufacturer."  A.C.A. §26-57-260.

**A.C.A. §26-57-261(2)(B)(ii)** (emphasis added).

The distinction is illustrated in an explanation of how an NPM could use the original allocable share refund (or "allocable share release") provision to its advantage, found in **Freedom Holdings, Inc. v. Spitzer**, 2004 WL 2035334 (S.D.N.Y. 2004):

> In practical effect, the Allocable Share Release provision provided NPMs with substantial competitive advantages from concentrating their efforts on regional distribution. If an NPM distributed its cigarettes nationally, and its distribution patterns approximated those of the national market, its payment obligations on its national sales would be apportioned 100 percent among the settling states, with the result that something close to 100 percent of its payments would, in the aggregate, be retained under the Escrow Statute and not released under the Allocable Share Release provision. However, if an NPM were to concentrate its business to the New York--New Jersey--Connecticut area, for instance, it could gain a competitive advantage in that region, because it would make 100% of its sales there and would be able to recoup the payments on all but roughly 16.5% of them, these being approximately the percentage shares of those states. While the OPMs and SPMs would be required to continue 100% of their payments under the MSA, an NPM which focused on the New York metropolitan area could be exempt (aside from the time-value of its money between when it was escrowed and when it was released) to the extent of over 80% of its business.

When viewed in the context of the statutes at issue, it becomes clear that what Grand River is really complaining about is the loss of the competitive advantage that could be enjoyed under the Allocable Share Refund provision. The cases cited by plaintiffs in support of their First Amendment argument will not support a claim that the loss of a competitive advantage (as opposed to the imposition of a burden not borne by other tobacco

-17-

companies) unconstitutionally burdens speech, regardless of whether it is commercial or political in nature. The Court, therefore, concludes that the Motion To Dismiss should be granted as to plaintiffs' free speech claims.

7. Defendant next contends that plaintiffs have failed to state a claim that their rights to equal protection have been violated, regardless of whether that claim is analyzed pursuant to the Equal Protection Clause of the 14th Amendment to the United States Constitution, or the equal protection provisions found in Article 2, §3 and §18 of the Arkansas Constitution.

State statutes are presumptively constitutional. **Lemon v. Kurtzman**, **411 U.S. 192 (1973),** citing **San Antonio Independent School District v. Rodriquez**, **411 U.S. 1 (1973).** Statutes dealing with economic issues must pass only a rational basis test to survive constitutional scrutiny. The rational basis test has been articulated by the United States Supreme Court as follows:

> Under rational-basis review, where a group possesses distinguishing characteristics relevant to interests the State has the authority to implement, a State's decision to act on the basis of those differences does not give rise to a constitutional violation. Such a classification cannot run afoul of the Equal Protection Clause if there is a rational relationship between the disparity of treatment and some legitimate governmental purpose. Moreover, the State need not articulate its reasoning at the moment a particular decision is made. Rather, the burden is upon the challenging party to negative any reasonably conceivable state of facts that could provide a rational basis for the classification.

**Board of Trustees of University of Alabama v. Garrett**, **531 U.S.**

**356, 367-68 (2001)**(internal citations and quotation marks omitted).

That same test has been articulated by the Arkansas Supreme Court as follows:

> There is a presumption of constitutionality attendant to every legislative enactment, and all doubt concerning it must be resolved in favor of constitutionality.  If it is possible for the courts to so construe an act that it will meet the test of constitutionality, they not only may, but should and will, do so.  The party challenging a statute has the burden of proving it unconstitutional.

**Holland v. Willis, 293 Ark. 518, 739 S.W.2d 529 (1987).**

The State of Arkansas clearly has the authority, under its police powers, to protect the health and welfare of its citizens. As evidenced by the Emergency Clause enacted with the Allocable Share Amendment, the State has found that tobacco use poses a threat to the health and welfare of those citizens, i.e., "smoking poses a serious health risk to Arkansans," and that the Allocable Share Amendment was necessary for the effective administration of the MSA, which "is a critical component in reducing the rate of smoking in Arkansas." **Act 384 of 2005, §5.** These provisions of the Emergency Clause reflect a rational relationship between the Amendment and its purpose.

Plaintiffs support their equal protection argument with their allegation that the Allocable Share Amendment "will increase Grand River's net escrow obligation under the Arkansas Escrow Statute by an amount nearly 1000% greater than the amount Arkansas would

receive from Grand River if it were a Participating Manufacturer under the MSA."  Even taking this allegation as true, it will not support plaintiffs' equal protection claims.  It is not what *Arkansas would receive* under the MSA, but what *Grand River would pay*, that is relevant.  And under the Allocable Share Amendment, Grand River cannot be required to pay more, for its Arkansas sales, than would a PM.  While one figure is computed on a direct per cigarette basis, and the other is computed as a percentage of market share, that is not dispositive.  As noted by the Supreme Court:

> In the area of economics and social welfare, a State does not violate the Equal Protection Clause merely because the classifications made by its laws are imperfect.  If the classification has some reasonable basis, it does not offend the Constitution simply because the classification is not made with mathematical nicety or because in practice it results in some inequality.  The problems of government are practical ones and may justify, if they do not require, rough accommodations - illogical, it may be, and unscientific.

**U.S.R.R. Retirement Board v. Fritz**, **449 U.S. 166, 175, (1980)** (internal citations and quotation marks omitted).

For the foregoing reasons, the Court concludes that plaintiffs' equal protection claims must be dismissed.

8.  Defendant next contends that plaintiffs have failed to state a claim for deprivation of property without due process of law.  Plaintiffs, for their part, respond that the Amendment violates not only procedural but also substantive due process.  The Court will examine these claims first from the perspective of

the Amendment as applied prospectively, and then as to its retroactive application, commencing with the issue of substantive due process.

9.    Before addressing those specific issues, it is necessary to determine whether plaintiffs have been deprived of a protected interest in liberty or property.  If so, then the substance and procedure attendant upon that deprivation are examined to see if they comport with due process.  **American Manufacturers Mutual Insurance Co. v. Sullivan, 526 U.S. 40 (1999).**

Defendant, while not contesting that Grand River has a property interest in the funds that must be escrowed under the Allocable Share Amendment, suggests that Grand River has not been *deprived* of that property interest, because the money paid into escrow continues to belong to Grand River unless and until the State files suit and either prevails at trial or achieves a favorable settlement of its claim.  This argument runs counter to established law.  "[A] temporary, nonfinal deprivation of property is nonetheless a 'deprivation' in the terms of the Fourteenth Amendment."  **Fuentes v. Shevin, 407 U.S. 67, 84-85 (1972).**  The Court, therefore, finds that Grand River has been deprived of an interest in property by the Allocable Share Amendment.

10.  In order to pass substantive due process muster, legislation need only have a rational relationship to a legitimate state objective.  The Due Process Clause "does not empower the

judiciary to sit as a superlegislature to weigh the wisdom of legislation." **Exxon Corp. v. Governor of Maryland, 437 U.S. 117, 124 (1978)** (internal quotation marks omitted). As explained in ¶7, *supra*, the Court has found a rational relationship between the Allocable Share Amendment and the State's expressed purpose of ensuring effective administration of the MSA, which is a critical component in reducing the rate of smoking in Arkansas. Thus, as to plaintiffs' claim that prospective application of the Allocable Share Amendment violates substantive due process, the Motion To Dismiss will be granted.

11. Plaintiffs contend that retroactive application of the Amendment is qualitatively different from prospective application. They point out that, in 2004 - prior to the enactment of the Allocable Share Amendment, which requires a higher per-cigarette payment than did the Allocable Share Refund provision - they made their pricing decisions in light of the Allocable Share Refund provision. Thus, plaintiffs argue, the escrow deposits they have already made are inadequate under the Allocable Share Amendment and, in fact, the cost to meet the new escrow deposits required under the Allocable Share Refund provision would exceed the revenue generated by their sales during that period of time.

The Supreme Court has long recognized that legislation can legitimately "sweep away settled expectations suddenly and without individualized consideration," and for that reason, "retroactive

statutes raise particular concerns." **Landgraf v. USI Film Products, 511 U.S. 244, 266 (1994)**. In **Landgraf**, the Supreme Court listed, as being of particular concern, legislative enactments which infringe on constitutional prohibitions against *ex post facto* laws, laws which impair the obligation of contracts, laws which effect takings without just compensation, bills of attainder, and laws which deprive an affected person of due process.

> Absent a violation of one of those specific [constitutional] provisions, the potential unfairness of retroactive civil legislation is not a sufficient reason for a court to fail to give a statute its intended scope. Retroactivity provisions often serve entirely benign and legitimate purposes, whether to respond to emergencies, to correct mistakes, to prevent circumvention of a new statute in the interval immediately preceding its passage, or simply to give comprehensive effect to a new law Congress considers salutary.

**511 U.S. at 267-68.**

Defendant argues that the purpose of the Allocable Share Amendment is "benign," "legitimate," and "meant to 'correct mistakes' resulting from the language of the original legislation," and that since the Amendment's intent to apply to 2004 escrow deposits is clear, there is no constitutional impediment to such application. As the Supreme Court stated in **Landgraf**, clear intent assures that the legislative body "has affirmatively considered the potential unfairness of retroactive application and determined that it is an acceptable price to pay

-23-

for the countervailing benefits." **511 U.S. at 272-73.**

In **Usery v. Turner Elkhorn Mining Co., 428 U.S. 1 (1976),** the Supreme Court took up a due process challenge to a federal statute which retroactively imposed on mining companies liability for injuries caused to miners by the conditions under which they worked, even in situations where the miners had terminated their employment before the statute was enacted. The Court there noted that

> legislative Acts adjusting the burdens and benefits of economic life come to the Court with a presumption of constitutionality, and that the burden is on one complaining of a due process violation to establish that the legislature has acted in an arbitrary and irrational way. . . . [L]egislation readjusting rights and burdens is not unlawful solely because it upsets otherwise settled expectations. . . . This is true even though the effect of the legislation is to impose a new duty or liability based on past acts.

**428 U.S. at 15-16.**

However, as explained in the later case of **Pension Benefit Guaranty Corp. v. R.A. Gray & Co., 467 U.S. 717, 733 (1984),**

> retroactive legislation does have to meet a burden not faced by legislation that has only future effects. It does not follow . . . that what Congress can legislate prospectively it can legislate retrospectively. The retroactive aspects of legislation, as well as the prospective aspects, must meet the test of due process, and the justifications for the latter may not suffice for the former. But that burden is met simply by showing that the retroactive application of the legislation is itself justified by a rational legislative purpose.

**467 U.S. at 730** (internal citations and quotation marks omitted).

Given that "retrospective civil legislation may offend due process if it is particularly harsh and oppressive," a standard which does not differ from "the prohibition against arbitrary and irrational legislation," **Pension Benefit, 467 U.S. at 733**, the Court finds that plaintiffs have stated a claim that the retroactive application of the Allocable Share Amendment violates their constitutional right to substantive due process, and the Motion To Dismiss as to that claim will be denied.

12. The Court next examines the procedure used to effect the deprivation of property worked by the Amendment. The fundamentals of procedural due process are, of course, notice and an opportunity to be heard:

> For more than a century the central meaning of procedural due process has been clear: Parties whose rights are to be affected are entitled to be heard; and in order that they may enjoy that right they must first be notified. It is equally fundamental that the right to notice and an opportunity to be heard must be granted at a meaningful time and in a meaningful manner.

**Hamdi v. Rumsfeld, 542 U.S. 507, 533 (2004)** (citations and internal quotation marks omitted).

13. Plaintiffs' procedural due process challenge, as to the prospective application of the Amendment, relates to the opportunity to be heard. Does it occur at a meaningful time, and in a meaningful manner? Depending upon the circumstances, this right may be fulfilled either before or after a deprivation. In **Mathews v. Eldridge, 424 U.S. 319 (1976),** the Supreme Court took

up the issue of whether - and under what circumstances - a due process hearing must be held *before* government deprives an individual of property.  The Court there stated that

> identification of the specific dictates of due process generally requires consideration of three distinct factors:  First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation of such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the Government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

**424 U.S. at 334-35.**

The Court now examines these factors to determine whether it appears that plaintiffs could prove facts under which procedural due process would require a pre-deprivation hearing in connection with their escrow payments:

(a)  The affected private interest, in this case, is the sums of money Grand River has been, and will in the future be, required to deposit into escrow and leave there for 25 years. These sums are alleged to be substantial, an allegation the Court accepts as true in connection with the Motion To Dismiss.  The weight of the private interest is offset by several factors, however.  The escrowed sums are no greater than the sums that OPMs are required to pay each year for the privilege of selling cigarettes, and NPMs, unlike OPMs, are not giving up ownership of their money.  While the escrow deposits are not tax deductible, as

are MSA payments, Grand River and the other NPMs are compensated for the loss of use of the escrowed funds by the interest that accrues on those funds, and the escrow payment obligation is not coupled with restrictions on speech to which the PMs are subjected. In view of these facts, the Court does not find that the private interest of the NPMs weighs very heavily in the **Mathews** analysis.

(b)  Although plaintiffs contend that the risk of an erroneous deprivation is substantial - they allege that the payments called for under the Amendment are not justified on the basis of any current showing of wrongful conduct on their part nor on the basis of "leveling the playing field" between NPMs and PMs - they do not dispute that their tobacco products, like any other tobacco products, have the potential to cause harm.  This undisputed fact reduces the risk of erroneous deprivation to a point where procedural safeguards - in addition to those attendant upon the litigation that would be necessary before the State could deprive an NPM of ownership of its escrowed funds - would be of little benefit.

(c)  The Amendment's Emergency Clause demonstrates the State's interest in this matter:  reduction of smoking, which requires effective administration and enforcement of the MSA.  A pre-termination hearing would entail significant burdens on this interest, as it would require premature litigation of potential

claims the State might levy against plaintiffs, with the attendant risks of erroneous decision and the expenses and burdens - on both the State and the NPMs - of litigation.

Given the relatively small risk of an erroneous deprivation, the minimal value of additional procedural safeguards, and the State's unquestionable interest in the matter, the Court concludes that plaintiffs could prove no set of facts under which a pre-deprivation hearing would be constitutionally required in order for the State to implement the Allocable Share Amendment.

Although the Court concludes that a pre-deprivation hearing is not required, that finding does not completely answer the procedural due process question because, at some point, Grand River will be entitled to a hearing if it is to be deprived of ownership of its escrowed funds.

Defendant contends that the available post-deprivation remedy is constitutionally sufficient -- in that Grand River will either have the right to release of the escrowed funds (after 25 years) or will have the issue resolved through litigation, with all its attendant procedural protections.

Plaintiffs disagree and insist that defendant's argument misses the point of their post-deprivation procedural due process contention: that the State can deprive an NPM of the use (although not the actual ownership) of its funds for up to 25 years without any hearing whatsoever.

It is axiomatic that for due process to exist, the right to be heard must come "at a meaningful time." **Fuentes v. Shevin, 407 U.S. 67, 80 (1972).** The Court's research has not disclosed any case in which a 25-year delay between deprivation and remedy has been approved - or even considered. However, the Supreme Court has offered some guidance as to how to evaluate the issue.

In **U.S. v. Eight Thousand Eight Hundred and Fifty Dollars, 461 U.S. 555 (1983),** the Court took up the question of "when a post-seizure delay may become so prolonged that the dispossessed property owner has been deprived of a meaningful hearing at a meaningful time," and approved a framework for determining whether the delay in providing a post-deprivation remedy violated the due process right to be heard at a meaningful time. The Court there said that the four factors to be considered were the same as those supplied in **Barker v. Wingo, Warden, 407 U.S. 514 (1972),** to-wit:

* the length of delay;

* the reason for the delay;

* the property owner's assertion of his rights; and

* prejudice to the property owner.

In this case, as in **U.S. v. Eight Thousand Eight Hundred and Fifty Dollars**, "the overarching factor is the length of the delay." There, the Court considered a delay of some 18 months to be "quite significant," but determined it to be reasonable on the facts of the case. Here, the delay of 25 years is obviously

-29-

"quite significant."  However, the reason given for the delay is also "quite significant" in the Court's view.  Smoking-related health problems (and their costs) take years to appear and, thus, the State needs a "quite significant" amount of time to evaluate whether a given NPM is responsible for those costs before taking legal action.  Plaintiffs do not suggest that the stated reason for the delay is false, nor do they persuasively argue that a lesser period of delay would serve the purpose equally well.  Thus, the Court finds that the first two factors weigh in favor of the defendant's position.

The fourth factor, prejudice to the NPMs, also tilts in favor of the defendant.  While the NPMs are deprived of the use of their escrowed funds pending the post-deprivation remedy, they are compensated for that loss by receiving interest on those funds.  Meanwhile, they are able to conduct their business without restrictions on their speech.  In the heavily-regulated tobacco industry, the resulting prejudice to the NPMs, on balance, is small.

The third factor, as made clear in **Barker**, is essentially a consideration of whether the property-owner acquiesces in any delay in obtaining a post-deprivation remedy.  Given that plaintiffs filed the instant litigation, that factor weighs in their favor.  It does not, however, outweigh the other factors in the Court's view.

After careful consideration, the Court believes that application of the **Barker** balancing test yields the conclusion that in the particular circumstances here presented, the post-deprivation remedy (either return of the funds at the end of 25 years or litigation if the right to return is disputed) is constitutionally sufficient. "[D]ue process is flexible and calls for such procedural protections as the particular situation demands." **Cafeteria & Restaurant Workers Union, Local 473, AFL-CIO v. McElroy, 367 U.S. 886 (1961).**

14. With regard to plaintiffs' allegation that retroactive application of the Amendment violates procedural due process, the Court finds that they have stated a claim based on lack of notice. "Generally, a legislature need do nothing more than enact and publish the law, and afford the citizenry a reasonable opportunity to familiarize itself with its terms and to comply," **Texaco, Inc. v. Short, 454 U.S. 516, 532 (1982).** In this case, however, plaintiffs did not have, and could not have had, notice of the existence of the Amendment in 2004, because it had not yet been enacted. The Court finds this allegation sufficient to state a claim for deprivation of procedural due process as to the retroactive application of the Amendment.

15. **Commerce Clause Claim** -- Defendant next contends that plaintiffs have failed to state a claim under the Commerce Clause of the United States Constitution.

The constitutional principles involved have been summarized by the Supreme Court as follows:

> Our Constitution was framed upon the theory that the peoples of the several states must sink or swim together. Thus, this Court has consistently held that the Constitution's express grant to Congress of the power to regulate Commerce . . . among the several States contains a further, negative command, known as the dormant Commerce Clause, that creates an area of trade free from interference by the States. This negative command prevents a State from jeopardizing the welfare of the Nation as a whole by plac[ing] burdens on the flow of commerce across its borders that commerce wholly within those borders would not bear. Thus, we have found unconstitutional state regulations that unjustifiably discriminate on their face against out-of-state entities, or that impose burdens on interstate trade that are clearly excessive in relation to the putative local benefits. We have held that States may not impose taxes that facially discriminate against interstate business and offer commercial advantage to local enterprises, that improperly apportion state assessments on transactions with out-of-state components, or that have the inevitable effect [of] threaten[ing] the free movement of commerce by placing a financial barrier around the State.

**American Trucking Associations, Inc. v. Michigan Public Service Commission**, 125 S.Ct. 2419 (2005) (internal citations and quotation marks omitted). The Supreme Court has also held that "[i]n evaluating state regulatory measures under the dormant Commerce Clause. . . the first step . . . is to determine whether it regulates evenhandedly with only incidental effects on interstate commerce, or discriminates against interstate commerce." **Fulton Corp. v. Faulkner**, 516 U.S. 325 (1996) (citations and internal quotation marks omitted).

The Allocable Share Amendment, on its face, makes no

distinction between interstate and intrastate transactions, acting even-handedly on all NPMs regardless of where they are situated. To the extent that it has any impact whatsoever on interstate commerce, that impact is indirect and incidental. The State's interest in regulating tobacco manufacturers is a legitimate one under its police powers, with significant local benefits, as expressed by the Emergency Clause. Nothing in plaintiffs' Complaint, or in their brief on the issue, indicates that they can prove up a set of facts under which any indirect impact on interstate commerce would exceed that State interest. The Motion To Dismiss plaintiffs' Commerce Clause claim will, therefore, be granted.

16. Finally, defendant claims that plaintiffs have failed to state a claim under the Supremacy Clause of the United States Constitution. Plaintiffs make no response to this argument, and the Court finds that it is conceded. The Motion To Dismiss will, therefore, be granted as to plaintiffs' Supremacy Clause claims.

**IT IS THEREFORE ORDERED** that **Defendant's Motion To Dismiss** (document #12) is **granted in part and denied in part**.

The motion is **denied** insofar as it seeks dismissal of plaintiffs' claims that retroactive application of **A.C.A. §26-57-260-261**, as amended by **Act 384 of 2005**, to plaintiff Grand River Enterprises Six Nations, Ltd.'s, 2004 escrow deposits violates substantive and procedural due process.

The motion is **granted** in all other respects.

**IT IS SO ORDERED.**

        **/s/ Jimm Larry Hendren**
        **JIMM LARRY HENDREN**
        **UNITED STATES DISTRICT JUDGE**